**CAROTHERS CONSTRUCTION COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 173–89C.

United States Claims Court.

June 6, 1990.

William R. Purdy, Jackson, Miss., for plaintiff. Samuel C. Kelly, Ott & Purdy, Ltd., of counsel.

Jonathan M. Kronheim, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Arup Bose, U.S. Army Corps of Engineers, of counsel.

## ORDER

NETTESHEIM, Judge.

This multi-claim contract case is before the court after argument on the parties' cross-motions for partial summary judgment. The issue for decision is whether a contractor was obligated to provide liner panels by its construction contract with the Government.

## FACTS

The following material facts are undisputed, unless otherwise noted. On March 10, 1986, the United States Army Corps of Engineers (the "Corps") awarded a contract to Carothers Construction Company, Inc. ("plaintiff"). Plaintiff agreed to construct two tactical equipment shops at Fort Stewart, Georgia, for the amount of $10,-948,392.00. The plans, specifications, and estimates for these shops were identical.

A notice to proceed was issued to plaintiff on April 14, 1986.

Each building was in a "horseshoe" configuration. There were two large parallel bays for servicing tanks and similar tactical vehicles, joined at one end by an administrative and warehouse area. Both buildings had metal siding on the exterior and a metal, standing seam roof. The lower wall elevations, *i.e.*, the bottom 10 feet or more, were constructed with brick on the exterior and concrete block on the interior. Metal siding was placed from the top of brick to the roof. The metal siding and metal roof were formed in panels.

The term "covering panel" refers to the metal panel attached to the exterior of the building. Covering panels include both metal siding ("metal wall covering panels") and metal roofing ("metal roof covering panels"). A "covering panel" forms a metal shell around the exterior of the building, thereby shielding the building from the elements. The term "liner panel" refers to the metal panel attached to the interior of the building. The contract either called for insulation above the concrete block between the covering panel and the interior, secured on the interior by insulation retaining straps, as plaintiff claims, or insulation faced by liner panels, as defendant claims.

Part I, § 7R8 of the contract, entitled "METAL ROOFING AND SIDING, FACTORY–COLOR FINISHED," is the applicable specification for metal panels. Paragraph 2 of section 7R8, entitled "GENERAL," provides in pertinent part: "Contract drawings indicate the extent and general assembly details of metal roofing and siding...." Paragraph 4 of section 7R8, "SAMPLES AND DESCRIPTIVE DATA," states that a sample of the wall liner shall be submitted for approval and the liner shall be "one piece, 9 inches long, full width."

Paragraph 7 "MATERIALS" provides, in pertinent part:

 7.1 Wall Covering and Roof Covering Materials: Wall and roof covering panels shall not exceed 30 feet in length and shall be steel....

7.1.1 Steel Covering: Zinc-coated steel conforming to ASTM A 446, G 90 coating designation, or aluminum-coated steel conforming to Mil.Spec. MIL–S–4174, Type II. Roof and wall liner panel shall be 24 galvanized sheet gage or thicker and roof and wall cover panel shall be 26 galvanized sheet gage or thicker.

The load and span requirements of paragraph 7.1.1 providing that the "wall liner panel shall be 24 galvanized sheet gage or thicker" was also carried forward in Contract Drawing No. 214–10–03, Plate S–1, the "Tactical Equipment Shop L. 1. 276 General Notes and Typical Details, Fort Stewart, Georgia" for "Siding Liner Panel."

Paragraph 7.4.1 of section 7R8 defines material specifications for rigid and semi-rigid board insulation. Paragraph 7.4.2 defines material specifications for blanket insulation. The Corps did not require rigid or semi-rigid board insulation to be installed on this contract.

Paragraph 7.5 of the specifications provides in full:

Insulation Retainers: Retainers shall be type, size, and design necessary to hold the insulation adequately and to provide a neat appearance. Metallic retaining members shall be nonferrous or have a nonferrous coating. Nonmetallic retaining members, including adhesives used in conjunction with mechanical retainers or at insulation seams, shall have a fire resistance classification not less than that permitted for the insulation.

Paragraph 8 of section 7R8, "INSTALLATION," provides, in full:

8.2 Wall Covering and Roof Covering Installation: Wall covering shall be applied with the longitudinal configurations in the vertical position. Roof covering shall be applied with the longitudinal configurations in the direction of the Roof slope. End laps shall be made over framing members with fasteners into framing members approximately 2 inches from the end of the overlapping sheet. Side laps shall be laid away from the prevailing winds. Side lap distances, end lap distances, and spacings of fasteners shall be in accordance with Table I at the end of this Section. Fasteners shall be installed in valleys or crowns as recommended by the manufacturer of the sheet being used. Crown fasteners shall be shoulder type. Fasteners shall be installed in straight lines within a tolerance of ½ inch in the length of a bay. Side laps and end laps of roof (and wall) covering and joints at accessories shall be sealed. Method of applying joint sealing shall conform to manufacturer's recommendation. Fasteners shall be driven normal to the surface and to a uniform depth to seat the gasketed washers properly. Accessories shall be fastened into framing members, except as otherwise approved. Scratched, chipped or otherwise abraded surfaces shall be touched up as necessary with the manufacturer's recommended touch-up paint.

Plaintiff has put at issue whether liner panels were required by the contract. Contract Drawing No. 214–10–03, Plates A–10 and A–11, both captioned "Wall Sections" designate "insulated metal wall panel" above the exterior brick. Drawing Plate No. S–1 refers to a "siding liner panel," but does not show a liner panel or give installation instructions, nor were liner panels or instructions depicted in any architectural plan or in the Finish Schedule. In contrast, particularized installation instructions were provided for wall and roof covering materials.

Part II, § 1, ¶ 6 of the contract captioned "Contract Drawing, Maps and Specifications" provides, in pertinent part:

(b) Omissions from the drawings or specifications or the misdescription of details of work which are *manifestly necessary to carry out the intent of the drawings and specifications, or which are customarily performed,* shall not relieve the Contractor from performing such omitted or misdescribed details of the work, but they shall be performed as if fully and correctly set forth and described in the drawings and specifications.

(Emphasis added.)

The contract also incorporated by reference the Federal Acquisition Regulation

("FAR"), 48 C.F.R. § 52.236–21(a), "Specifications and Drawings for Construction." The regulation stipulates, in pertinent part, that

> [a]nything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern. In case of discrepancies ... in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing....

Since concrete walls to a height of 10 feet-plus were specified for each shop and the shops were used to service and store tanks, plaintiff sees no need for liner panel to face the balance of the interior wall and roof. Plaintiff interpreted the contract to require the securing of insulation by insulation retainers, as permitted by paragraph 7.5.

Defendant takes the position that the drawings indicate that the liner panels were to perform a structural function that retainers could not render. Defendant reads the contract to require that the walls and the roof of the equipment shops be constructed with insulated sandwich panels. These panels were to be comprised of an interior steel liner panel, insulation, and an exterior steel cover panel. Defendant sees this intent demonstrated in the drawings by the straight dark or double line on the interior and exterior of the insulation. According to defendant, although the contract drawings do not refer specifically to liner panels, the term in the contract drawings "insulated metal wall panel" indicates use of a cover panel, insulation, and a liner panel.

Apparently, as the result of a question that arose between the parties during performance, Sean B. Carothers, plaintiff's President and Project Manager, on May 1, 1986, sent a letter to Contracting Officer Thomas A. Trapani. Mr. Carothers stated that it was unclear as to whether the wall and roof liners were required for the project. There was no reply to the letter, and Mr. Carothers once again requested clarification by letter dated May 30, 1986.

Contracting Officer Trapani sent a letter to plaintiff on June 16, 1986, stating that liner panels were required per specification § 7R8, ¶ 7.1.1. On June 19, 1986, Mr. Carothers responded to this letter by requesting a meeting to discuss the liner panels. It was Mr. Carothers' opinion that installation of liner panels was not "adequately covered by Contract plans and specifications." Mr. Carothers' letter was answered by C. Alex Morrison, Jr., identified as an Authorized Representative of the Contracting Officer. In his letter of June 24, 1986, Mr. Morrison stated that the contracting officer's position remained the same as communicated in the June 10 letter and that if plaintiff still disagreed on the matter, it had the right to submit a claim. Mr. Carothers wrote in his letter of July 1, 1986, that he assumed that his request for a meeting was denied because it was not acknowledged in the Corps' June 24 letter; further he understood that the Corps had directed plaintiff to install roof and wall liner panels in the equipment shops. Mr. Trapani once again stated in a letter dated August [illegible], 1986, that his position remained the same.

Plaintiff filed with the contracting officer a claim and request for equitable adjustment in the amount of $372,248.65 for the costs incurred from the liner panels and their installation. However, defendant took the position in its proposed findings that the amount in controversy is $333,810.80. Plaintiff's claim stated that "[t]he type of insulation specified in section 7R8 does not require a metal liner, and is suitable for its intended use without a liner panel...." Plaintiff contended that the provision for a neat appearance in paragraph 7.5 of that section is not an essential contract requirement unless the insulation was exposed to view. Plaintiff took the position that the specifications indicate that the insulation would not be exposed to view and that other Corps' contracts for similar buildings at Fort Stewart clearly had indi-

cated liner panels in the drawings, whereas the drawings in the instant case do not.

Since the contracting officer did not issue a final decision on this claim, plaintiff elected to treat the non-decision as an adverse decision which may be appealed to this court. 41 U.S.C. § 605(c)(5) (1988). Plaintiff filed its complaint on March 30, 1989.

## DISCUSSION

Summary judgment is appropriate where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); RUSCC 56(c). Plaintiff's claim to an equitable adjustment for installation of wall liners cannot be resolved by summary disposition.

The issue to be decided by the court is whether *vel non* an ambiguity exists as to the use of liner panels in the construction of the tactical equipment shops. The court must inquire whether the plain meaning of the terms of the contract gives rise to differing constructions and whether the discrepancy would be apparent to the reasonably prudent contractor. *Monarch Painting Corp. v. United States*, 16 Cl.Ct. 280, 286–87 (1989); *John C. Grimberg Co. v. United States*, 7 Cl.Ct. 452, 456, *aff'd*, 785 F.2d 325 (Fed.Cir.1985) (Table). "[A]n interpretation that gives a reasonable meaning to all parts of a contract will be preferred to one that leaves portions of the contract meaningless." *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985) (citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983)). An ambiguity exists when a contract is susceptible to two different interpretations, each of which is found to be consistent with the contract's language. *Sun Shipbuilding & Dry Dock Co. v. United States*, 183 Cl.Cl. 358, 372, 393 F.2d 807, 815–16 (1968). If plaintiff's interpretation is reasonable, from the point of view of a reasonable contractor, the contract will be interpreted against the Corps as its drafter. *Grimberg*, 7 Cl.Ct. at 456.

■ Defendant argues that plaintiff should be held responsible for costs that could have been avoided had plaintiff inquired as to inconsistencies in the solicitation materials. Relying upon the fact that plaintiff did not call the alleged ambiguity to the Corps' attention until after the contract was bid upon, defendant invokes the doctrine of patent ambiguity. A patent ambiguity must be " 'so glaring as to raise a duty to inquire.' " *Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 414 (Fed.Cir.1988) (quoting *United States v. Turner Constr. Co.*, 819 F.2d 283, 286 (Fed.Cir.1987) (emphasis in original)). If the ambiguity is patent then a duty arises on the nondrafting party to inquire as to its meaning. *J.B. Steel, Inc. v. United States*, 810 F.2d 1139, 1141 (Fed.Cir.1987) (contractor has duty to scrutinize drawings and specifications for potential problems prior to bidding). The contractor must inquire as to only major discrepancies, obvious omissions, or drastic conflicts in contract provisions. *WPC Enterprises v. United States*, 163 Ct.Cl. 1, 6, 323 F.2d 874, 877 (1963). It is the obviousness of the discrepancy that imposes the duty upon the contractor, not the actual knowledge of the contractor. *Chris Berg, Inc. v. United States*, 197 Ct.Cl. 503, 515, 455 F.2d 1037, 1045 (1972). The failure to recognize an obvious ambiguity does not excuse the contractor from his affirmative duty of inquiry. *See, e.g., J.A. Jones Constr. Co. v. United States*, 184 Ct.Cl. 1, 395 F.2d 783 (1968). In order to avoid expensive and complex litigation courts place the duty to inquire upon the contractor. *J.B. Steel*, 810 F.2d at 1141; *Beacon Constr. Co. v. United States*, 161 Ct.Cl. 1, 6–7, 314 F.2d 501, 504 (1963).

Both parties contend that the contract is unambiguous. Plaintiff finds the contract clear because there is no difference between the drawings and specifications supplied by the Corps. According to plaintiff, neither the specifications nor the drawings detail the installation of liner panels. Further, the FAR regulation applicable to omissions in either the drawings or the specifications does not apply when a re-

quirement is not set forth in either the drawings or the specifications. That the specifications govern is not relevant, in plaintiff's view, because the specifications do not state anything about the furnishing or installation of liner panels. The specifications instruct plaintiff to consult the drawings, which do not give instructions for installation.

Assuming that an ambiguity is present, plaintiff argues that the mere recitation of the properties for wall liner panels, in paragraph 7 of section 7R8, does not mean that installation of liner panels is required. This information is pertinent only if there is a separate, explicit requirement for their installation. Plaintiff points to the fact that the specifications make mention of both rigid insulation and blanket insulation. Even though material specifications set out properties for rigid and blanket insulation, both types of insulation were not required. The blanket insulation was installed and only after the Corps gave its approval. Plaintiff applies the same reasoning to the Samples and Descriptive Data provision, paragraph 4 of section 7R8. Paragraph 4 includes some of the dimensions of liner panels, but does not inform plaintiff of the manner in which the panels are to be installed. Plaintiff interprets this section to mean that a sample of liner panel was to be submitted only if it were required for installation. Plaintiff asserts that this lack of information would lead the reasonable contractor to conclude that the liner panels were not required.

Focusing on the drawings, plaintiff argues that no indication was present that metal wall panels were to be placed against the insulation facing the interior of the equipment shop. Because the drawings explicitly showed cover panels, plaintiff advances that it reasonably inferred that liner panels were not required. Moreover, since liner panels did not appear on the "Finish Schedule" of Drawing No. 214–10–03, Plate A–6, plaintiff asserts that it reasonably concluded that the liner panels were not required. By contrast, plaintiff reminds the court that both exterior wall panels and roof panels were mentioned on the Finish Schedule's "LEGEND OF COLORS." In sum, plaintiff charges that "[d]efendant has no explanation for why the Contract did not specify installation of liner panels nor depict them anywhere on the drawings...." Plf.Br. filed Feb. 5, 1990, at 37.

Defendant rejoins that section 7R8 of the specifications details the properties required of wall liners and requires that conforming wall liners be submitted for approval. Additionally, defendant points to the notes on Plate S–1, which describe the load and span requirements for liner panels. Defendant argues: "These requirements demonstrate the importance of the liner panels to the contract. It is difficult to understand how these technical requirements can be satisfied if the liner panels are not used...." Def.Br. filed Nov. 30, 1989, at 11–12. As to the omission of liner panels from the Finish Schedule, defendant asserts that the missing entry does not omit the requirement to install liner panels from the terms of the contract. Defendant notes the fact that stair railings in the equipment shop did not appear on the Finish Schedule, yet stair railings were both provided and painted.

In support of its contention that liner panels were a contract requirement, defendant submitted declarations from two Corps officials. Marion Harrison, Jr., Chief of the Architectural Section of the Savannah District, U.S. Army Corps of Engineers, avers that the Guide Specifications specifically were redrafted for this project so as to include the requirement for liner panels. Declaration of Marion Harrison, Jr., Mar. 23, 1990, ¶¶ 4–5. Mr. Harrison asserts that the requirement for "insulated metal wall panel" on Drawing Plates A–10 and A–11 instructs the contractor to furnish a cover panel, insulation, and a liner panel. Harrison Decl. ¶ 9. Moreover, the otherwise unexplained dark, double lines on Drawing Plate A–11, in Mr. Harrison's view, refer to the requirement for a liner panel. If these lines did not, asserts Harrison, the insulation to be installed would not be of a uniform width—as it appears in the drawing—but compressed at some points and distended in others. He explains:

The specifications also provide that the "contract drawings indicate the extent and general assembly detail of the metal roofing and siding." The various wall sections in the Drawings graphically illustrate the requirement for liner panels. On drawings A–11, for example, the interior side of the insulation for the wall panel in wall section 1, and the roof panels in section 2, 3 and 4 are bracketed by a straight dark, or double line.... While the line is not labeled as liner panel, its presence in the drawing shows that there is an architectural or structural component which is not otherwise explained. Reference to the specifications shows that the line represents liner panel....

*Id.* ¶ 8.

Gary R. Close, Lead Structural Engineer on the Corps' project, agrees that the contract drawings call for a "sandwich-type" configuration consisting of an exterior cover panel, insulation, and a liner panel. Declaration of Gary R. Close, Mar. 16, 1990, ¶¶ 2–3. Mr. Close references his own contributions to Plate S–1 as support for this requirement. The notations to Drawing Plate S–1 detail the minimum required strength and load that the panels ought to bear. Mr. Close states that because liner panels have an important load-carrying function, and because the stresses on the liner panels are different from the forces exerted on the wall and roof panels, he set out in the drawing notes the specific characteristics for a liner panel. Since the cover panel is not sufficient to carry the weight of the insulation alone, Mr. Close concludes that if liner panels were omitted from construction, the intent of the design would not be met. Close Decl. ¶¶ 4–7.

In reply plaintiff submitted the views of its own expert, Robert K. McGrath. Mr. McGrath is an structural engineer with experience working on government construction contracts. Mr. McGrath takes issue with the Harrison/Close interpretation of the specifications and drawings and with the view that liner panels perform a structural function. Citing *Means Illustrated Construction Dictionary,* (W. Mahoney ed. 1986), Mr. McGrath disputes that the

requirement in the specifications for an "insulated metal panel" evinces a need for a cover panel, insulation, and a liner panel. Mr. McGrath avers that the construction industry defines "insulated metal panel" as "a single panel which is composed of an insulating material such as glass or foam and is faced with a light-gauge flexible metal...." Declaration of Robert K. McGrath, Apr. 26, 1990, ¶ 10. By contrast, a "sandwich panel" is "composed of two metal panels—cover and liner panel—which are separated by an insulating core." *Id.* In Mr. McGrath's view, the contract specifications require only that an insulated panel be provided, so that an additional liner panel is not called for under the contract.

Moreover, Mr. McGrath asserts that the contract drawings do not call for installation of liner panels. The dark double lines pointed to by defendant have no dimensional features; in Mr. McGrath's opinion, these lines cannot communicate to the builder that liner panels are intended or required. McGrath Decl. ¶¶ 8–9. By contrast, metal roof and wall panels on the exterior of equipment shops are depicted with dimensional features. *Id.* ¶ 8.

Lastly, Mr. McGrath contests the view that liner panels serve an important structural function in the equipment shop. In his experience liner panels have never been used for a structural purpose. In this contract plaintiff submitted, and the government approved, a series of clips and joists for use in holding the insulation in place. "Accordingly, the weight of the applied loads to the exterior cover panels are transmitted to the structural steel joists and not to the installed liner panels." McGrath Decl. ¶ 16.

Defendant argues that the contract as a whole demonstrates a requirement for liner panels. Defendant relies on *B.D. Click Co. v. United States,* 222 Ct.Cl. 290, 614 F.2d 748 (1980). The Court of Claims considered the use of statements in the contract, such as "contract drawings indicate the extent and general arrangement of the sprinkler system," and "[a]nything mentioned in the specifications and not shown in the draw-

ings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both," in determining whether the contractor was required to install water sprinklers. 222 Ct.Cl. at 299, 614 F.2d at 753. The sprinklers were not depicted in any of the contract drawings. As a result of the extensive and explicit installation instructions in the *B.D. Click* contract, the court held unreasonable plaintiff's interpretation that only the components of the system depicted in the drawings were to be installed. "[A]ny omission or deficiency in the drawings ... was supplied by the specifications." *Id.* Defendant urges that since the contract in the instant case has the identical language covering the effect of omissions as that of *B.D. Click*, the same interpretation must govern. However, *B.D. Click* can be distinguished because there were over 11 pages of discussion on the components, installation, and testing of water sprinklers in that contract. In the case at bar, although the properties of liner panel are specified, there is no mention of liner panel installation in the 6 pages of contract specifications governing metal roofing and siding.

 Both parties should be disabused of the notion that the contract provisions are clear and unambiguous. Sufficient mention of siding liner panel and metal wall panel appears in the drawings to reject plaintiff's argument that the drawings are silent. On the other hand, the Corps perpetuated specifications that omitted installation instructions for liner panels, and the reference to metal wall panels may not evince a sandwich panel. The drawings designate specifically exterior metal wall panels, and Mr. Harrison admits that liner panels were not designated. Although specifications and drawings are not required to be a paradigm of clarity, the requirement for liner panels in the contract cannot be established without the assistance of experts to aid the court in resolving what the drawings communicate.

The interpretative disputes between Messrs. Harrison and Close, on the one hand, and Mr. McGrath, on the other, re-quire trial. The record developed to date, excluding the declarations and affidavit of experts, would not support a holding that the discrepancies were so glaring and obvious as to require a reasonably prudent contractor to seek clarification of the contract requirements. The reference to liner panels in the specifications and Drawing Plate A–1, coupled with both the omission of installation instructions in the specifications and the omission of a reference to liner panels on Drawing Plates A–10 and A–11, do not create the kind of drastic conflict that gives rise to a duty to inquire.

However, although the testimony of experts could establish a patent ambiguity, plaintiff has made two arguments that mitigate against a patent ambiguity. First, an earlier Corps' contract with virtually identical plans and specifications for a tactical equipment shop at Fort Stewart depicted numerous design details for the installation of roof and wall liner panels. Although plaintiff did not rely on this contract in forming its interpretation, plaintiff points out the lack of these drawings on an identical project indicated that the liner panels were not required. Defendant would respond that Drawing Plate A–11 from a similar contract supports its contention that liner panels were required. Mr. Harrison points out that if a liner panel were not present, the insulation would vary in thickness. The insulation would be compressed where it encountered a roof support, but would resume its normal thickness where no roof support was present. Drawing Plate A–11 of this earlier contract details insulation, the thickness of which varies across the length of the roofing panel.

Second, the Corps' cost estimates for the project did not include liner panels. The Corps estimated that each building would require 77,457 square feet of roofing panels and 16,707 feet of siding panels. Plaintiff's estimate was based only on the use of cover panels and its estimate was almost identical to that of the Corps. Plaintiff estimated that 76,998 square feet of roofing panels were needed per building. For both roofing and wall panels, the Corps estimated 94,164 square feet per building. Plaintiff estimated 94,041 square feet. The

total square footage in the two estimates differed by only 123 square feet. If both liner panels and cover panels were provided for in the Corps' estimate, then the estimate would have been doubled.

Assuming that the ambiguity is latent, the experts' testimony will be instrumental in sustaining plaintiff's interpretation as reasonable.

## CONCLUSION

Accordingly, based on the foregoing,

IT IS ORDERED, as follows:

The parties' cross-motions for partial summary judgment are denied. A scheduling order has been entered separately.